```
          IN THE UNITED STATES DISTRICT COURT
       FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                      AT BLUEFIELD
```
BLUEFIELD GAS COMPANY,

    Plaintiff,

v.                                CIVIL ACTION NO. 1:09-cv-01497

ABBS VALLEY PIPELINE, LLC

    Defendant.

## MEMORANDUM OPINION AND ORDER

Pending before the court is the defendant's motion for partial summary judgment on Counts One, Two and Four of the complaint. Doc. No. 44.[1] For the reasons set forth more fully below, the defendant's motion for partial summary judgment on the statute of limitations is **GRANTED**.

### I. Background

#### a. Factual History

Bluefield Gas Company ("BGC") is a West Virginia corporation with its principal place of business in West Virginia. Abbs Valley Pipeline ("AVPL") is a limited liability company whose members are citizens of states other than West Virginia. BGC is a public utility company that supplies natural gas to approximately 5,000 customers. The primary source for this gas is Columbia Gas Transmission Company, which has an

---

[1] Also pending before the court are the parties' cross motions for summary judgment. Docs. No. 106, 108. These motions will be addressed in a separate order.

1

interstate pipeline near Princeton, West Virginia. In 1995, BGC received an offer from Phoenix Energy Sales Company ("Phoenix") to become a secondary supplier to BGC. In order to establish this secondary supply, eight miles of new pipeline was required. Although the parties initially discussed jointly constructing and operating the new pipeline, they ultimately agreed that Phoenix would build and operate approximately six miles of line, and BGC would build and operate approximately two miles of the pipeline. BGC would reimburse Phoenix for its costs of construction for those six miles of pipeline through the payment of a reservation fee. The negotiations for the contract, carried out over a period of two years, culminated in the execution of a four page "Gas Purchase/Sales Contract" between BGC and Phoenix dated October 27, 1997 ("1997 Contract"). Doc. No. 50, Exhibit 1, pp. 5-9.

### The 1997 Contract

The 1997 Contract laid out the procedures by which the gas would be sold:

> The quantity of gas under this Contract shall be specified in the Nomination of Forms. Unless otherwise stated in the Nomination Forms, Buyer will notify Seller by the fifteenth day of each calendar month of the volume of gas Buyer will purchase from Seller during the succeeding Nominating Period. Unless otherwise stated in the Nomination Forms, Buyer shall purchase each month the full volume of gas nominated by Buyer or Buyer's designee.

1997 Contract, Article 1.1, Doc. No. 50, Exhibit 1, p. 7. Article XI of the Terms and Conditions states the remedies available when the buyer fails to take the nominated quantity of gas:

> 11.1 If the sale(s) hereunder is identified on the Nomination Form(s) as "firm", "fixed take", "baseload", or "minimum take" sales, the following additional remedies are available if either party fails to perform its obligations.
>
> 11.2 [I]n the event that the Buyer is in breach of this Contract for failure to take gas deliveries, then Seller shall mitigate its damages by making reasonable efforts to sell the gas to another market. Thereafter, Buyer shall be obligated to pay Seller damages equal to the difference between the contract price identified on the Nomination Form and the price reasonably paid to Seller by another market.

1997 Contract, p. 8.

When Phoenix Energy and BGC entered into the 1997 Contract, they agreed that BGC would pay a reservation fee of $3.50/Dth.[2] The Contract provided that the reservation fee "will be redetermined after initial investment and financing charges are recovered (to be determined based on actual pipeline costs and interest rates), based on operating expenses and a reasonable ROE utilizing FERC guidelines for regulated pipelines." 1997 Contract, Paragraph 2, p. 5. The Seller projected the reservation fee would be recovered in 46-58 months, as communicated in a letter dated October 16, 1997, from

---

[2] Dth refers to dekatherm, a unit of measurement for heat for natural gas. See Doc. No. 45, at page 2.

Mr. Joseph Vanzant of Phoenix to BGC. Doc. No. 50, Exhibit 1, p. 9. The estimated construction cost was $700,000 to $800,000.

The Vanzant letter stated that a reservation fee below $2.00/Dth, plus operating costs, "would be sufficient to provide an acceptable return on our investment." Doc. No. 50, Exhibit 1, p. 9.

In 1998, Phoenix assigned the 1997 Contract to Bluefield Pipeline, LLC, an affiliate of T&F Exploration, LP. In 2005, the 1997 Contract was purchased by Abbs Valley Pipeline ("AVPL"). AVPL was then a newly formed West Virginia limited liability company owned by Dart Oil & Gas Corporation ("Dart") and Abarta Oil & Gas Company ("Abarta"). When AVPL undertook the assignment of the 1997 Contract in 2005, its due diligence report shows the consideration of the reservation fee, and the recognition that the fee had not been redetermined:

> In regard to the Gas Purchase/Sales contract between Phoenix Energy Sales (Bluefield Pipeline, LLC) and Bluefield Gas, the Reservation Charges were established to be in place for 46-58 months during which PES recovered "initial investment and financing charges." Afterwards, per an October 16, 1997 letter from PES to Roanoke Gas (Bluefield Gas), the Reservation Charges would decrease from $3.50 per Dth to $2.00 per Dth. [ . . .] As we move into 2005, we are well past the 58 month period. In discussion with Frank Ross, he stated that in recent meetings with Bluefield Gas, the amounts of the Reservation Charges have not been an issue and not discussed. Since the October 16, 1997 letter from PES is not part of the contract, this topic is not an issue at this time.

Exhibit 19 to Mr. Straslicka's deposition, Doc. No. 106, Exhibit 15, pp. 40-41.

In 2006, the BGC and AVPL entered into a second contract, ("2006 Contract"). The 2006 Contract involved drilling more wells and selling more gas to AVPL. Although it was discussed that the parties might simply amend the 1997 Contract, they ultimately decided to draft a new contract, which was not to replace the 1997 Contract. To validate that the 1997 Contract was still in force, the 2006 Contract says:

> The existing Gas Purchase/Sales Contract between Buyer and Phoenix Energy Sales Company dated October 27, 1997, as amended, as subsequently assigned to Seller, with all its stipulations, terms and conditions as to gas delivered thereunder remains in full force as is, and the delivery point under that agreement will remain the same.

2006 Contract, Doc. No. 106, Exhibit 6, p. 11. There is no reservation fee in the 2006 Contract.

The 1997 Contract did not explicitly state which party was responsible for redetermining the reservation fee; however, the defendant has stipulated that "[f]or purposes of this [summary judgment] Motion it is assumed, as claimed by BGC, that it was the unilateral obligation of PES [Phoenix] to make this redetermination under paragraph 2 of the Contract and that the failure of PES to take such action 'by 2003' was a breach of the Contract." Doc. No. 45, p. 2. BGC first raised the issue of excess reservation

5

fees prior to this litigation with AVPL in an email March 2, 2009, when it asserted that "[b]y our estimate the cost of that line was fully recovered by 2003 and as a result Bluefield is entitled to a refund." Doc. No. 45, p. 4.

The plaintiff's complaint alleges breaches of both the 1997 Contract and the 2006 Contract. The plaintiff alleges that AVPL breached the 1997 Contract by failing to redetermine the reservation fee, as required by the 1997 Contract. Because of this failure, BGC alleges, it was charged an excessive fee since 2003. The breach alleged regarding the 2006 Contract deals with charges relating to "shrinkage."[3] The Defendant's Motion for Partial Summary Judgment only affects the claims under the 1997 Contract.

### b. Procedural History

Invoking this court's diversity jurisdiction, BGC filed the instant claim on December 16, 2009, asserting five claims against AVPL. Count One seeks a declaratory judgment that AVPL breached the 1997 Contract. Count Two seeks damages for breach of contract based on reservation fees under the 1997 Contract. Count Three seeks damages for breach of contract in regard to shrinkage charges. Count Four claims that AVPL has been unjustly enriched in regard to the reservation fees charged.

---

[3] Although there are cross-motions for summary judgment on the claims under the 2006 Contract, the current opinion deals solely with the statute of limitations issue.

6

Finally, Count Five claims unjust enrichment in regard to the shrinkage charges.

AVPL filed a petition to compel arbitration and a motion to dismiss for failure to state a claim on January 8, 2010. Doc. No. 6. After briefing, this court denied AVPL's petition to compel arbitration, finding that the plaintiff's claims for excessive reservation fees falls under Section 2 of the contract, which does not have an arbitration requirement. Doc. No. 24 at 8-9. Similarly, this court held that the plaintiff's claim for excessive shrinkage charges arises under an amendment to the 1997 contract, which is not subject to an arbitration requirement. Doc. No. 24 at 9-10.[4]

AVPL answered the complaint and filed a counterclaim against BGC, alleging that BGC was in breach of the 1997 Contract and 2006 Contract. Doc. No. 32. Count One of the counterclaim alleges that BGC did not take the full monthly amounts under the 1997 Contract. Count II alleges that BGC breached the 2006 Contract by seeking a reduction of the reservation fee under the 1997 Contract. Count III alleges that BGC owes more reservation fees under Section 10 of the 1997

---

[4] The court granted the motion to dismiss the plaintiff's unjust enrichment claims, Counts Four and Five, for failure to state a claim upon which relief can be granted. (Doc. No. 24). The motion to dismiss was denied in all other respects (Doc. No. 24).

7

Contract. Count IV seeks a declaratory judgment that the reservation fee cannot be re-determined.

The defendant has moved for summary judgment on Counts One and Two, arguing that the statute of limitations has run on any alleged breach of the 1997 contract.

## II. Analysis

### a. Standard for Summary Judgment

In evaluating summary judgment motions, Rule 56(a) of the Federal Rules of Civil Procedure provides:

> The court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

Fed. R. Civ. P. 56(a).

Material facts are those necessary to establish the elements of a party's cause of action. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party, a reasonable juror could return a verdict for the non-movant. Id.

The moving party has the burden of establishing that there is an absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Even if there is no dispute as to the evidentiary facts, summary

8

judgment is not appropriate where the ultimate factual conclusions to be drawn are in dispute. Overstreet v. Kentucky Cent. Life Ins. Co., 950 F.2d 931, 937 (4th Cir. 1991). If the moving party meets its burden, then the non-movant must set forth specific facts that would be admissible in evidence that demonstrate the existence of a genuine issue of fact for trial. Celotex, 477 U.S. at 322-23.

### b. Choice of Law

The 1997 Contract contains the following choice of law provision: "The sale of gas hereunder shall be deemed to have occurred within and be governed by the laws of the State of Virginia." The plaintiff argues that the current dispute is not about "the sale of gas" and that West Virginia law should apply to the statute of limitations issue, and the defendant argues that Virginia law should apply, due to the choice of law provision in the contract.

In this diversity action, the court is to apply the choice-of-law rules of the forum state, West Virginia. Wells v. Liddy, 186 F.3d 505, 521 (4th Cir. 1999). Additionally, procedural matters are typically governed by the law of the forum state. Selected Kentucky Distillers, Inc. v. Foloway, 124 W. Va. 72 (1942). Under West Virginia's choice-of-law rule, procedural matters include the statute of limitations, and are governed by West Virginia law. McKinney v. Fairchild Int'l,

9

Inc., 199 W. Va. 718, 727 (1997). West Virginia has a borrowing statute, providing that "the period of limitation applicable to a claim accruing outside of this State shall be either that prescribed by the law of the place where the claim accrued, or by the law of this State, whichever bars the claim. W. Va. Code § 55-2A-2.

AVPL contends that plaintiff's claim is governed by the Uniform Commercial Code (UCC) and barred by either state's statute of limitations, applicable to claims under the UCC. If the UCC applies, the statute of limitations in this case is limited to four years regardless of whether the court applies Virginia or West Virginia law. Va. Code § 8.2-275; W.Va. Code § 46-2-725. If the UCC does not apply, the common law will apply. In West Virginia, the statute of limitations for contracts in writing is ten years; in Virginia, it is five years. W. Va. Code § 55-2-6.

### c. The 1997 Contract is Governed by the UCC

The UCC only applies to contracts involving the sale of goods, and specifically includes the sale of gas. See Va. Code § 8-2.107(1); W.Va. Code § 46-2-107(1). The court rejects the defendant's argument that the 1997 Contract is a singular contract and is not hybrid; instead holding that is a hybrid contract, that is, a contract involving both the sale of goods (natural gas) and involving services (building the pipeline).

The majority test that is employed to determine whether hybrid contracts are governed by the UCC is the "predominant purpose" test, which states:

> [t]he test for inclusion or exclusion is not whether they are mixed, but, granting that they are mixed, whether their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service, with goods incidentally involved (*e.g.*, contract with artist for painting) or is a transaction of sale, with labor incidentally involved (*e.g.*, installation of a water heater in a bathroom).

Bonebrake v. Cox, 499 F.2d 951, 960 (8th Cir. 1974). The "predominant purpose" test has been followed by numerous jurisdictions, including courts in Virginia and West Virginia. See Princess Cruises v. GE, 143 F.3d 828 (4th Cir. 1998)(applying the predominant purpose test to an admiralty case); see Prestige Magazine Co. v. Panaprint, Inc. 2010 U.S. Dist. LEXIS 114097 (S.D.W. Va. 2010)(applying the predominant purpose test to a contract for the printing of magazine, and holding that the UCC did not apply because the predominant purpose was the rendition of services).

Another test employed by courts in this context is there "gravamen-of-the-action test." The gravamen of the action test, unlike the predominant purpose test, divides the mixed contract into two components: goods and services. See, e.g. TK Power, Inc. v. Textron, Inc. 433 F.Supp. 2d 1058, 1063-65 (N.D. Ca. 2006). This approach allows the application of Article 2 to the

11

goods aspect of a mixed transaction when the dispute relates to the goods even though the predominant purpose of the transaction is not the sale of goods.

The plaintiff contends that the West Virginia Supreme Court has disapproved of the "predominant purpose" test in <u>Elkins Manor v. Eleanor Concrete Works</u>, 183 W. Va. 501 (1991), and instead urges the adoption of the lesser-used "gravamen of the action" standard. <u>Elkins Manor</u> involved a building construction contract, where the defendants allegedly failed to abide by the "time is of the essence" provision of the contract, and a dispute arose whether the UCC should apply to the contract. <u>Id.</u> Although the West Virginia Supreme Court does, at first glance, seem critical of the predominant purpose test, it is clear that its critique is limited solely to the application of the UCC to construction contracts: "the <u>Bonebrake</u> [predominant purpose] test . . . is too subjective to provide any rational analysis of <u>most building contracts</u>." <u>Id.</u> at 507 (emphasis added). Additionally, nowhere in the <u>Elkins Manor</u> decision, or any other decision, does the West Virginia Supreme Court apply or even mention the alternate standard offered by the plaintiff, the "gravamen of the action" test. Thus, this court will apply the majority "predominant purpose" standard to the case at hand.

The predominant purpose of the 1997 Contract is the sale of gas. The contract itself is entitled "Gas Purchase/Sales Contract," and makes clear that the primary purpose was to supply gas, not to build a pipeline. The contract is a "transaction of sale, with labor incidentally involved," more similar to the installation of a water heater in a bathroom than a contract with an artist for a painting. See Bonebrake v. Cox, 499 F.2d 951, 960 (8th Cir. 1974). Additionally, the cost of constructing the pipeline is built into the price of the sale of gas, further demonstrating that the primary purpose of the contract is the sale of gas, not the construction of the pipeline. Because the primary purpose of the contract is the sale of gas, the UCC provides the applicable statute of limitations.

  d. Counts One and Two are Barred by the Four-Year Statute of Limitations

Virginia and West Virginia have adopted identical relevant provisions of the UCC. See W. Va. Code § 46-2-725; Va. Code § 8.2-725. In these provisions, the UCC provides that "[a]n action for breach of any contract for sale must be commenced within four years after the cause of action has accrued. By the original agreement the parties may reduce the period of limitation to not less than one year but may not extend it." W. Va. Code § 46-2-725.

The issue then becomes determining when the cause of action has accrued. Under the UCC, the four-year statute of limitations begins to run "after the cause of action has accrued," and "a cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach." W. Va. Code § 46-2-725. Both parties concede that the cost of the line was fully recovered by 2003, and discovery has made clear that the cost of the line was recovered in October of 2002.[5]

The plaintiff contends that the contract is an installment contract, and that the Seller breached the contract each time it charged in excess of the reservation fee, beginning in October 2002. The plaintiff further argues that even under the UCC, it can recover for four years of overcharges, even if some of the claim is time-barred.

Conversely, the defendant argues that the alleged breach occurred in October 2002, when the cost of the line was recovered but the fee was not redetermined. Thus, the defendant argues that the statute of limitations ran in October of 2006, more than two years before this suit was filed.

The West Virginia Supreme Court has stated that the basic purpose of statutes of limitation is to encourage promptness in

---

[5] AVPL Motion for PSJ; BGC Response. Doc. No. 45, 50. The parties have indicated that this fact is no longer in dispute.

instituting actions, to suppress stale demands or fraudulent claims, and to avoid inconvenience which may result from delay in asserting rights or claims when it is practicable to assert them. Morgan v. Grace Hospital, Inc., 144 S.E.2d 156 (W. Va. 1965). Statutes of limitations compel the exercise of a right of action within a reasonable time, and they cannot be avoided unless the party seeking to do so brings himself strictly within some exception. Humble Oil & Refining Co. v. Lane, 152 W.Va. 578, 582-3 (1969). The Supreme Court of Virginia has explained its policy of rigid application of the statute of limitations:

> [W]ithout limitations on actions, defendants could find themselves at the mercy of unscrupulous plaintiffs who hoard evidence that supports their position while waiting for their prospective opponents to discard evidence that would help make a defense. In light of the policy that surrounds statutes of limitation, the bar of such statutes should not be lifted unless the legislature makes unmistakably clear that such is to occur in a given case. Where there exists any doubt, it should be resolved in favor of the operation of the statute of limitations. Thus, courts are obligated to enforce statutes of limitations strictly and to construe any exception thereto narrowly.

Westminster Investment Corp. v. Lamps Unlimited, Inc. 237 Va. 543, (1989).

The Fourth Circuit has similarly held:

> Statutes of limitations are not mere technicalities. Rather, they 'have long been respected as fundamental to a well-ordered judicial system. Board of Regents v. Tomanio, 446 U.S. 478, 487 (1980). They are designed not to defeat justice, but to promote it by preventing 'surprises through the revival of claims

15

> that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared.' <u>Order of R.R. Telegraphers v. Railway Express Agency, Inc.</u>, 321 U.S. 342, 348-49 (1944). By encouraging parties to file their claims promptly, statutes of limitations protect litigants from the potential errors of witness recall that might otherwise result. They reflect the need to have a point at which the possibility of litigation is past, and in due course they replace the uncertain prospects of a potential litigant with repose.

<u>Hamilton v. 1st Source Bank</u>, 928 F.2d 86, 89 (4th Cir. 1990)(en banc).

The defendant calls this case a "textbook" example of why statutes of limitations were created. Indeed, many changes have occurred while this claim has slumbered. AVPL was not a party to the contract at the time of its formation or at the time of the breach. Further, AVPL rightly points out that its company was not even formed at the time of the creation of the contract or at the time of the breach in 2002. The contract was assigned to two separate parties during the span of the performance. The defendant points to numerous employees that have changed jobs and left the company, including R. James Schweizer, the President of Dart and the person most involved in negotiations with BGC, who left the company in May of 2007 and was tragically killed in a motorcycle accident the following year. Doc. No. 4 at pg. 9.

While it is obvious to this court that the reservation fee should have been redetermined once the cost and expenses were

recovered, it is also clear that BGC had a reasonable time period with which to raise this issue.  BGC was aware that the estimated time for a redetermination was by 2003, yet it did not raise the issue until 2009.  It is clear that the four-year statute of limitations has run on this claim unless the plaintiff has pointed to an acceptable exception into which it falls.

The plaintiff argues that it is well-established in both Virginia and West Virginia that for obligations payable in installments the statute of limitations commences to run against each installment from the time it becomes due.  In considering the question of when the statute of limitations begins to run against an action to recover upon a contract payable in installments, the approach has traditionally been the presence of an obligation to pay a definite or lump sum amount by the making of partial or installment payments.  See G.T. Fogle & Co. v. King, 132 W.Va. 224 (1948) (where a special assessment for street paving was treated as a lien against adjacent property, and the lien was payable in installments); Williams v. Matthews, 103 Va. 180 (1904).  There is no such obligation to pay a definite or lump sum in the case at hand.  Rather, BGC was obligated to reimburse Phoenix for its "initial investment and financing charges. . .determined based on actual pipeline costs and interest rates" and to redetermine a fee "based on operating

17

expenses and a reasonable ROE utilizing FERC guidelines for regulated pipelines."

The plaintiff cites a series of cases that assert the proposition that in an installment contract, the statute of limitations begins to run against each installment from the time it becomes due. However, each of the plaintiff's cases deal with recovery on obligations to pay a definite or lump sum. Additionally, the plaintiff does not cite a single case that is applying the UCC. See Maynard v. Board of Educ. of Wayne Co., 178 W. Va. 53, 58 (1987)(In written employment contracts, governed by the 10-year statute of limitations, the statute of limitations commences to run against each installment from the time where the money recovery sought is unpaid salaries); Sansom v. Sansom, 148 W. Va. 603, 607-8 (1964)(stating that recovery was possible for lease payments due within the limitations period of an implied, not written contract); G.T. Fogle & Co. v. King, 132 W.Va. 224, 236-37 (1948)(holding that claim for street paving assessments, as liens against properties, due within limitation period was not time-barred) Cather v. Seneca-Upshur Petroleum, Civil Action No. 1:09CV139, 2010 U.S. Dist. LEXIS 85077, *24 (N.D.W. Va. Aug. 18, 2010) (claim for royalties due under mineral lease within the limitation period was not time-barred under West Virginia law).

The plaintiff has failed to bring itself "strictly into some exception" of the statute of limitations.

Under Virginia law, the plaintiff's claim would similarly be time-barred. The defendant urges that the court adopt the reasoning in <u>Westminster Investing Corp. v. Lamps Unlimited, Inc</u>., 237 Va. 543, 549 (1989), which rejected the plaintiff's "continuous breach" theory by relying on Virginia code on statute of limitations. <u>Id.</u> In that case, more than nine years into a ten years lease, the plaintiff lessee attempted to sue its lessor for failing to enforce a lease clause promising uniform hours of operation by all tenants of a shopping center. <u>Id.</u> To avoid the five-year limitations period applicable to such claims, the tenant asserted that a new claim arose each day that the uniform hours of operation clause was not enforced by the landlord. The Virginia court rejected this theory in that case, holding that the cause of action for breach accrued and the statute of limitations began to run of the first day the contract was breached. <u>Id</u>. at 549.

In sum, the four-year statute of limitations in this case began to accrue in October of 2002, and ran in October of 2006. The UCC makes clear that it does not matter whether BGC knew the contract had been breached at that time, although there is significant evidence that it did know, or at least should have known. The plaintiff has not pointed to a viable exception

19

which would allow it to escape the statute of limitations issue. The result of this case would likely not change whether the court applies Virginia or West Virginia law.

For these reasons the court finds that the claims for the alleged breaches occurring in the four years prior to the filing of this suit are time-barred by the statute of limitations.

### III. Conclusion

For the foregoing reasons, the defendant's motion for summary judgment is **GRANTED** on Counts One and Two.

It is **SO ORDERED** on this 9th day of January, 2012.

ENTER:

*David A. Faber*
David A. Faber
Senior United States District Judge